**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

---

**UNITED STATES OF AMERICA,**

**-v-**

**MICHAEL D. HAYDEN, JR.,**          **Criminal Number:  RDB-13-0649**
**MICHAEL D. HAYDEN, JR., INC.,**
**WILLIAM J. LEDNUM**
 **a/k/a. "WILLIAM J.LEDNUM**
          **FISHERIES d/b/a"**
**KENT SADLER, and**
**LAWRENCE "DANIEL" MURPHY,**

          **Defendants.**

---

UNITED STATES CONSOLIDATED
TRIAL MEMORANDUM, *IN LIMINE* MOTIONS &
MOTION TO COMPEL

TABLE OF CONTENTS

STATEMENT OF THE CASE ...................................................................................................... 1

STATUTORY/REGULATORY FRAMEWORK ........................................................................ 2

   1)   The Atlantic Striped Bass Fisheries Act, Atlantic States Fisheries Commission, and Related
Interstate and Federal Compacts ............................................................................................. 2

   2)   Maryland Regulations Relevant to Striped Bass ................................................................ 3

   3)   The Lacey Act ..................................................................................................................... 4

      a)   False Labeling ................................................................................................................. 5

      b)   Trafficking ..................................................................................................................... 6

      c)   Attempt .......................................................................................................................... 8

STATEMENT OF FACTS:  CASE OVERVIEW ........................................................................ 9

   1)   MDNR Seizures ................................................................................................................... 9

   2)   Search Warrants & Documentary Evidence ...................................................................... 9

   3)   Interviews & Admissions .................................................................................................. 11

   4)   Witness Intimidation ......................................................................................................... 13

CHARGES CONTAINED IN THE INDICTMENT .................................................................. 14

   1)   Conspiracy ......................................................................................................................... 15

   2)   Lacey Act ........................................................................................................................... 16

   3)   Witness Retaliation & Tampering ..................................................................................... 16

IN LIMINE MOTIONS & OTHER EVIDENTIARY ISSUES ................................................. 18

   1)   Confessions & Non-Testimonial Statements of Co-Conspirators ..................................... 18

      a)   The Statements .............................................................................................................. 18

      b)   The Statements are Admissible as Against the Defendant Who Made Them as Party-opponent
Admissions ................................................................................................................................. 19

      c)   The "Check-in" and "Boat Ride" Statements are Admissible as Statements of Co-conspirators
in Furtherance of the Conspiracy. ............................................................................................. 20

d)   All Three Statements are also Admissible as Statements Against Penal Interests....................... 22

e)   The Admission of Both Statements in the Government's Case-in-Chief Would Not Violate the Confrontation Clause. ........................................................................................................... 24

2)   Regulatory Expert Testimony ........................................................................................... 26

3)   Defendants' Prior Convictions......................................................................................... 29

4)   Reciprocal Discovery Violations & Motion to Preclude Non-Disclosed Expert Testimony .......... 30

a)   Discovery Exchange To Date .................................................................................... 30

b)   Government's Motion to Preclude Defense Expert Testimony & To Set a Deadline for the Production of All Other Reciprocal Discovery ....................................................................... 31

OTHER TRIAL ISSUES ........................................................................................................... 35

1)   Overt Acts Not Listed in the Indictment are Admissible to Prove the Conspiracy....................... 35

2)   The Lack of Stipulations Will Necessitate Calling Additional Witnesses and Unnecessarily Prolong the Trial. .................................................................................................................. 36

3)   The United States Intends to Call Several Cooperating Witnesses................................................ 37

CONCLUSION ......................................................................................................................... 38

<u>TABLE OF AUTHORITIES</u>

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ............................................................. 20

*Brulay v. United States*, 383 F.2d 345 (9th Cir.) ............................................................ 35

*Bruton v. United States*, 391 U.S. 123 (1968) ................................................................ 25

*Bryan v. United States*, 524 U.S. 184 (1998) ................................................................... 6

*Daubert v. Merrell Dow  Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........................ 26

*Davis v. Washington*, 547 U.S. 813 (2006) ..................................................................... 24

*McLean v. United States*, 2011 WL 148313 (W.D.N.C. Jan. 18, 2011) ........................ 35

*Ratzlaf v. United States*, 510 U.S. 135 (1994) .................................................................. 6

*RSM, Inc. v. Herbert*, 466 F.3d 316 (4th Cir. 2006) .......................................................... 6

*United States v. Adamo*, 534 F.2d 31 (3d Cir.), *cert. denied*, 429 U.S. 841 (1976) ................. 35

*United States v. Allemand*, 34 F.3d 923 (10th Cir. 1994) .................................................. 6

*United States v. Armone*, 363 F.2d 385 (2d Cir. 1966) .................................................. 35

*United States v. Avila Bargas*, 570 F.3d 1004 (8th Cir. 2009) ...................................... 25

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010) ........................................... 26, 27

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008) .............................................. 26

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) ............................................. 27

*United States v. Blevins*, 960 F.2d 1252 (4th Cir. 1992) ............................................... 20

*United States v. Brown*, 934 F.2d 886 (7th Cir. 1991) .................................................. 16

*United States v. Bryan*, 122 F.3d 90 (2d Cir. 1997) ..................................................... 35

*United States v. Bumpass*, 60 F.3d 1099 (4th Cir. 1995) .............................................. 22

*United States v. Burns*, 298 F.3d 523 (6th Cir. 2002) ................................................... 17

*United States v. Calbas*, 821 F.2d 887 (2d Cir. 1987) .................................................. 36

*United States v. Calderon*, 554 Fed Appx. 143 (4th Cir. 2014) ................................... 24

*United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003) ............................................... 15

*United States v. Crisp*, 324 F.3d 261 (4th Cir. 2003)................................................................26

*United States v. Cruz*, 363 F.3d 187 (2d Cir. 2004)..................................................................27

*United States v. Damra*, 621 F.3d 474 (6th Cir. 2010) ............................................................24

*United States v. Dargan*, 738 F.3d 643 (4th Cir. 2013) ...............................................22, 23, 25

*United States v. Davis*, 380 F.3d 183 (4th Cir. 2004) ..............................................................17

*United States v. DePew*, 932 F.2d 324 (4th Cir. 1991)..............................................................15

*United States v. Dorsey*, 45 F.3d 809 (4th Cir. 1995)...............................................................34

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003)............................................................27

*United States v. Duncan*, 42 F.3d 97 (2d Cir. 1994)............................................................27, 28

*United States v. Fejes*, 232 F.3d 696 (9th Cir. 2000)..................................................................5

*United States v. Fountain*, 277 F.3d 714 (5th Cir. 2001)........................................................5, 6

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1997)................................................................35

*United States v. Galloway*, 749 F.3d 238 (4th Cir. 2014) .........................................................27

*United States v. Halfmann*, No. 11-CR-241, 2012 WL 3583443 (E.D. Wis., Aug. 20, 2012) ....................9

*United States v. Harris*, 542 F.2d 1283 (7th Cir. 1976), *cert. denied*, 430 U.S. 934 (1977) ......................35

*United States v. Heater*, 63 F.3d 311 (4th Cir. 1995) ...............................................................20

*United States v. Hopkins*, 916 F.2d 207 (5th Cir. 1990) ...........................................................16

*United States v. Iskander*, 407 F.3d 232 (4th Cir. 2005) ..........................................................34

*United States v. Janati*, 374 F.3d 263 (4th Cir. 2004) ..............................................................35

*United States v. Jasper*, 00-CR-825 (PKL), 2003 WL 223212 (S.D.N.Y., Jan. 31, 2003)........................32

*United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009) ...........................................................25

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009) ...........................................................27

*United States v. Jordan*, 509 F.3d 191 (4th Cir. 2007) .............................................................22

*United States v. Kingston*, 971 F.2d 481 (10th Cir. 1992) ..........................................................6

*United States v. Kivanc*, 714 F.3d 782 (4th Cir. 2013) .............................................................23

*United States v. Kraft*, 162 Fed. Appx. 664 (8th Cir. 2006) .......................................................6

*United States v. Lee*, 937 F.2d 1388 (9th Cir. 1991)..................................................................8

*United States v. LeVeque*, 283 F.3d 1098 (9th Cir. 2002) ...........................................................8

*United States v. Lewis*, 240 F.3d 866 (10th Cir. 2001) .............................................................28

*United States v. McDougall*, 25 F. Supp. 2d 85 (N.D.N.Y. 1998)................................................8

*United States v. Millan-Colon*, 836 F. Supp. 1007 (S.D.N.Y. 1993)..........................................36

*United States v. Mohney*, 949 F.2d 1397 (6th Cir. 1991)), *cert. denied*, 504 U.S. 91 ..........27, 28

*United States v. Norris*, 749 F.2d 1116 (4th Cir. 1984)..............................................................15

*United States v. Pratt*, 239 F.3d 640 (4th Cir. 2001) .................................................................20

*United States v. Reyes*, 798 F.2d 380 (10th Cir. 1986) ..............................................................36

*United States v. Russo*, 483 F.Supp.2d 301 (S.D.N.Y. 2007) .....................................................33

*United States v. Ryan*, 448 F.Supp. 810 (S.D.N.Y.1978) ...........................................................33

*United States v. Santillan*, 243 F.3d 1125 (9th Cir. 2001) ...........................................................8

*United States v. Schurr*, 794 F.2d 903 (3d Cir. 1986)................................................................35

*United States v. Scop*, 846 F.2d 135 (2d Cir. 1988)...................................................................27

*United States v. Shores*, 33 F.3d 438 (4th Cir. 1994), cert. denied, 514 U.S. 1019 (1995) .................20, 21

*United States v. Smith*, 63 F.3d 766 (8th Cir. 1995) ..................................................................36

*United States v. Snype*, 441 F.3d 119 (2d. Cir. 2006)................................................................15

*United States v. Tapia-Ortiz*, 23 F.3d 738 (2d Cir. 1994).........................................................27

*United States v. Taylor*, 71 F. Supp. 2d 420 (D. N.J. 1999) ......................................................34

*United States v. Tedder*, 801 F.2d 1437 (4th Cir. 1986) ............................................................15

*United States v. Todd*, 735 F.2d 146 (5th Cir. 1984) ...................................................................8

*United States v. U.S. Gypsum Company*, 600 F.2d 414 (3d Cir.), *cert. denied*, 444 U.S. 884 (1979)........35

*United States v. Udeozor*, 515 F.3d 260 (4th Cir. 2008)............................................................23

*United States v. Urbanik*, 801 F.2d 692 (4th Cir. 1986) ............................................................20

*United States v. Victor*, 973 F.2d 975 (1st Cir. 1992)................................................................17

*United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988) ..........................................................34

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ........................................................24

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) .................................................26, 27

*United States v. Wilson*, 796 F.2d 55 (4th Cir. 1986) .................................................... 17

*Whorton v. Bockting*, 549 U.S. 406 (2007) ..................................................................24

*Williamson v. United States*, 512 U.S. 594 (1994)..................................................22, 23

*Zimmerman v. United States*, 3:07CV295, 2011 WL 744509 (W.D.N.C. Feb. 23, 2011)........................ 35

## Statutes

16 U.S.C. § 3372..........................................................................................................passim

16 U.S.C. § 3373....................................................................................................4, 5, 7

Fed. R. Evid. 702 ........................................................................................................ 26

## Other Authorities

Federal Criminal - JI3C 6.18.1513B, Mod. Crim. Jury Instr. 3d. Cir. 6.18.1513B ................................... 16

*Federal Criminal Jury Instructions of the Seventh Circuit* § 5.11 (1980 Ed.),........................................... 16

Ninth Circuit Pattern Jury Instructions 9.12 (2011)..............................................................5, 7

*Pattern Jury Instructions, Criminal Cases*, Fifth Circuit (1990 Ed.)....................................15, 17

S. Rep. No. 123, 97th Cong., 1st Sess. 11..............................................................................8

## Regulations

Md. Code Ann, Natural Resources Article 4-701 ..........................................................3, 4, 12

Md. Code of Regs. ("COMAR") § 8.02.15.01 *et seq* ......................................................3, 4

Md. Code of Regs. § 08.02.05 ..............................................................................................4

The United States of America, by and through its counsel, Rod J. Rosenstein, the United States Attorney for the District of Maryland and Sam Hirsch, Acting Attorney General, United States Department of Justice, hereby submit this Consolidated Trial Memorandum, Motions *in Limine*, and Motion to Compel.

<u>STATEMENT OF THE CASE</u>

This prosecution is the result of the above-captioned defendants and several of their respective employees engaging in a multi-prong conspiracy to illegally harvest and falsely-label Striped Bass (*Morone saxatilis*; a.k.a., "Rockfish") from the Chesapeake Bay.  The defendants also sold these illegally taken Striped Bass in interstate commerce.  In an effort to conceal this illegal harvesting and labeling, the conspirators submitted false documents to the Maryland Department of Natural Resources ("MDNR").  The MDNR in turn used the data from these documents in reports filed with the Atlantics States Marine Fisheries Commission and related interstate and Federal agencies.  Once the defendants learned that a Grand Jury investigation was underway, they learned who had been subpoenaed and engaged in efforts to prevent some witnesses from testifying and attempted to manipulate the testimony of others.  In at least one instance, Michael Hayden and William Lednum also threatened a witness they believed to be cooperating with law enforcement.

Based on this conduct, a Federal Grand Jury sitting in Baltimore returned a 26-count Indictment (Doc. 17) against the above-captioned defendants on November 20, 2013.  Following the return of the Indictment, defendant Sadler pled guilty to Count 1 of the Indictment (Doc. 56).

<u>STATUTORY/REGULATORY FRAMEWORK</u>

**1)  The Atlantic Striped Bass Fisheries Act, Atlantic States Fisheries Commission, and Related Interstate and Federal Compacts**

Pages 3 through 5 of the Indictment (Doc. 17) provide an overview of the various interstate, inter-governmental, and Federal agencies involved in the management of Striped Bass throughout the eastern waters of the United States (to include the Chesapeake Bay).  The United States incorporates the description herein by reference.  The import of the summary contained in the Indictment is that federal and interstate agencies to include the Atlantic States Marine Fisheries Commission, Interstate Fisheries Management Program, Striped Bass Management Board, Department of Commerce, and U.S. Fish and Wildlife Service all work together to regulate the commercial harvesting of Striped Bass in states along the eastern seaboard to include Maryland.  More specifically, a fisheries management plan is in place for the commercial harvesting of Striped Bass.  States, including Maryland, must submit their Striped Bass fishery regulations to the Department of Commerce, Interstate Fisheries Management Program ("IFMP"), and Atlantic States Marine Fisheries Commission ("ASMFC") to ensure compliance with that Fisheries Management Plan.  Moreover, the State of Maryland must report its commercial harvest of Striped Bass in a particular season to the Department of Commerce, ASMFC, and IFMP so that the Fisheries Plan and state quotas for harvesting the following seasons may be adjusted to maintain a viable Striped Bass Fishery.  The State of Maryland, as described below, depends on licensed commercial fishermen to honestly and accurately report the numbers and weights of the Striped Bass they harvest at Maryland-approved check stations and in paperwork submitted to MDNR and ultimately, the ASFMC and IFMP.

**2)  Maryland Regulations Relevant to Striped Bass**

The State of Maryland, in Md. Code Ann, Natural Resources Article 4-701 *et seq*. and

Md. Code of Regs. ("COMAR") § 8.02.15.01 *et seq*., prescribe the time, place, and manner by

which Striped Bass may be legally taken, possessed, labeled, and sold by commercial fishermen.

This regulatory framework is set forth in specific detail on pages 5 through 11 of the Indictment

(Doc. 12).  Distilled:

- Maryland will set a "target harvest" (total number/pounds of fish that may be harvested in the State) for Striped Bass, including gill netting, based on information provided by interstate fisheries commissions.  COMAR §§ 08.02.15.02(B)(9) (*eff*. 4/6/2009), 08.02.15.02(B)(8) (*eff*. 3/29/1993).
- Based on that target harvest, Maryland will set "allocations" or the total numbers/weights of fish each commercial fishermen can take during a given season.  COMAR §§ 08.02.15.04(A-B) (*eff*. 7/12/1998, 4/6/2009)
- Commercial fishermen in Maryland must register to participate in a given commercial season.  Once registered, Maryland provides such commercial fishermen with an "allocation." That registration/allocation comes with an explanatory letter that specifies, among other things, the laws/regulations pertaining to gill net (a copy of which was found at the defendants' residences' during the execution of search warrants; Chesapeake-GOV-5176-5181, 5709-5712, 5882-5887; Chesapeake-GOV-6562).[1] COMAR §§ 08.02.15.04(A)-(B) (*eff*. 7/12/1998, 4/6/2009)
- Commercial fishermen with an allocation card also receive tags that must be affixed to each fish netted and which must remain in place until sold (i.e., "a tagged fish is a legal fish").  If a commercial fishermen ran out of tags, they could request additional tags from the State, provided the state's "target harvest" had not yet been reached.  COMAR §§ .08.02.15 (A)(2) (*eff*. 4/6/2009, 9/30/1990).
- The tagging system changed during the pendency of the conspiracy.  Prior to April 2009 the tags specified only a unique number and the State of origin and the same tags were used for both the Striped Bass gill net and hook and line fisheries.  Prior to that date, commercial fishermen did not need to return unused tags.  After that date, the tags listed a unique number, year of issuance, and specific gear-type used to take the fish (gill-net vs. hook-and-line).  Furthermore, after that date, commercial fishermen had to return unused tags to the State of Maryland.
- Commercial fishermen must "check-in" gill-netted fish at a "check-station" each day they fish at which point they fill out a "Striped Bass Harvest Permit" listing the date, number

---

[1]  At various points in this brief, the United States will reference by document control number some of the documentary and other evidence (already provided through the course of discovery) it intends to present at trial to establish the facts recited herein.  The United States will gladly provide these documents to the Court upon request.

of fish caught, pounds, and check-station identification number. COMAR §
08.02.15.05(D) (*eff.* 4/6/2009, 6/10/2002).

- At the end of each month, each licensed commercial fisherman must also complete a
  monthly summary of all check-ins during a given month and submit that to the State of
  Maryland. COMAR § 08.02.15.06 (*eff.* 4/6/2009, 1/17/2005).
- Maryland uses the aforementioned paperwork to monitor and report to the ASMFC,
  IFMP, and Department of Commerce, the overall harvest (and the rate of a harvest)
  during a given season.
- Maryland specifies the days during which gill netting can occur – most often December 1
  through the end of February. COMAR §§ 08.02.15.07(A)(3) (*eff.* 4/3/2000),
  08.02.15.12(H) (*eff.* 4/12/2004); 08.02.15.03(D)(1) (eff. 4/12/2004).
- Maryland may suspend a season early or suspend part of a season if the harvest rate is too
  high. For example, Maryland suspended the gill-netting season from January 17, 2011 at
  12:00 a.m. until February 1, 2011 at 3:00 a.m. *Id.*
- Maryland also specifies the manner of gill-netting for a given season. Specifically, no
  nets can be set after 6:00 p.m. or before 3:00 a.m. (i.e., commercial fishermen cannot
  leave nets set in the water overnight). *Id.*
- Gill-nets must remain attended at all times. COMAR §§ 08.02.15.07(D) (*eff.* 4/6/2009),
  08.02.05.02(A)(2) (*eff.* 11/20/1994).
- Gill nets must be able to drift and cannot be anchored to the bottom. COMAR §§
  08.02.05.02(B)(1) (*eff.* 9/3/1990), 08.02.05.02(A)(1) (*eff.* 9/3/1990).
- Regardless of the commercial fisherman's daily allocation, there cannot be more than
  2,000 pounds of Striped Bass on board a vessel on any given day.
- Commercial fishermen cannot buy, sell, ship, transport, or otherwise deal in Striped Bass
  harvested by another individual without a commercial seafood dealer's license (which
  Hayden did not procure until January 6, 2011). Md. Code Ann., Natural Resources §§ 4-
  701(d)(4) (*eff.* 6/1/2007), 4-702(a) (*eff.* 7/1/2007)

### 3) The Lacey Act

The Lacey Act, 16 U.S.C. §§ 3371 *et seq.*, is the nation's oldest wildlife protection

statute, which Congress sought to broaden as an effective wildlife law enforcement tool. Pages 2

through 3 of the Indictment provide definitions with corresponding citations to the Lacey Act

and are incorporated herein by reference. As relevant to this case, the Lacey Act prohibits the

"trafficking" of tainted fish as well as the false-labeling of fish sold in interstate commerce.

These are distinct offenses each with their own elements prescribed by *both* the "prohibited acts"

provision (16 U.S.C. § 3372) and "penalties" section (16 U.S.C. § 3373). The distinction bears

emphasis as the defendants, in their motions, have conflated these two offenses and the elements of proof needed to prove each.

### a) **False Labeling**

The Lacey Act makes it unlawful "for any person to make or submit any false record, account, or label for, or any false identification of, any fish . . . which has been, or is intended to be . . . (2) transported in interstate or foreign commerce."  16 U.S.C. § 3372(d)(2).  In turn, the criminal penalties for a false labeling violation of the Lacey Act, Section (d)(3)(A)(ii), state:

> Any person who knowingly violates subsection (d) or (f) of section 3372 of this title . . . (A) shall be fined . . . or imprisoned . . . or both, if the offense involves . . . (ii) the sale or purchase, offer of sale or purchase, or commission of an act with intent to sell or purchase fish . . . with a market value greater than $350.

16 U.S.C. § 3373(d)(3)(A)(ii).

In order for a defendant to be found guilty of a felony *false labeling* Lacey Act charge under 16 U.S.C. § 3372(d)(2) and 16 U.S.C. § 3373(d)(3)(A)(ii), the United States must prove the following elements:

> *First:* That the defendant did knowingly make or submit a false record, account, label or false identification of any fish, in this case, Striped Bass;

> *Second:* That the Striped Bass had been or were intended to be transported in interstate commerce; and

> *Third:* That the offense involved the sale or purchase of, the offer of sale or purchase of, or the commission of any act with the intent to sell or purchase Striped Bass with a market value greater than Three Hundred Fifty Dollars ($350.00).

16 U.S.C. §§ 3372 (d)(2) and 3373(d)(3)(A)(ii); *see also* Ninth Circuit Model Criminal Jury Instructions 9.10 (2011); *United States v. Fejes*, 232 F.3d 696 (9th Cir. 2000).

Courts have determined that the Lacey Act False Labeling crime is a knowing offense. *United States v. Fountain*, 277 F.3d 714, 717 (5th Cir. 2001).  As such, the Government need only prove "the facts that constitute the offense;" the Government need not prove that the

Defendants knew that they were acting illegally.  *Id.* (citing *Bryan v. United States*, 524 U.S.
184, 193 (1998); *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see also RSM, Inc. v.
Herbert*, 466 F.3d 316, 320 (4th Cir. 2006) ("Knowingly typically refers only to one's
knowledge of the facts that make his conduct unlawful, not to one's knowledge of the law.").

Moreover, the Lacey Act false labeling crime does not require proof of materiality.
*Fountain*, 277 F.3d at 717.  Thus, the Government need only prove that the defendants made or
submitted the false record, account, or label for, or identification of, fish; it need not prove that
the falsehood was relied upon.  *Id.*  Indeed, the Government need not even prove that the
defendants had a legal duty to make or submit the record -- "making or submitting false records
is illegal regardless of whether one has a duty to submit those records." *United States v.
Allemand*, 34 F.3d 923, 926-27 (10th Cir. 1994) (citing *United States v. Kingston*, 971 F.2d 481,
488 (10th Cir. 1992)); *see also United States v. Kraft*, 162 Fed. Appx. 664, 666 (8th Cir. 2006)
(finding that the defendant submitted false records despite the fact that the defendant "chose to
complete…that form" and it was "not required to be provided").

**b)  Trafficking**

The Lacey Act makes it "unlawful for any person . . . to . . . transport, sell, receive,
acquire, or purchase in interstate or foreign commerce . . . any fish . . . taken, possessed,
transported, or sold in violation of *any* law or regulation of *any* State."  16 U.S.C. §
3372(a)(2)(A) (emphasis added).    In turn, the criminal penalties section for a trafficking
violation of the Lacey Act, Section 3373(d)(1)(B), states:

> Any person who . . . (B) violates any provision of this chapter . . . by knowingly
> engaging in conduct that involves the sale or purchase of, the offer of sale or
> purchase of, or the intent to sell or purchase, fish or wildlife or plants with a
> market value in excess of $350, knowing that the fish or wildlife or plants were
> taken, possessed, transported, or sold in violation of, or in a manner unlawful

<div align="center">6</div>

under, *any* underlying law, treaty or regulation . . . shall be fined . . . or imprisoned.

16 U.S.C. § 3373(d)(1)(B) (emphasis added).[1]

In order for a defendant to be found guilty of a felony *trafficking* Lacey Act charge under 16 U.S.C. § 3372(a)(2)(A) and 16 U.S.C. § 3373(d)(1)(B), the United States must prove the following elements:

> *First:* The defendant did knowingly transport, sell, receive, acquire, or purchase fish, in this case, Striped Bass, or intended to do so, in interstate commerce;

> *Second*: That in doing so the defendant knowingly engaged in conduct that involved the sale or purchase of, the offer to sell or purchase, or the intent to sell or purchase Striped Bass;

> *Third*:  That the Striped Bass had been taken, possessed, transported or sold in violation of or in a manner unlawful under state law or regulation.

> *Fourth*: That the defendant knew that the Striped Bass were taken, possessed, transported or sold in violation of, or in a manner unlawful under a state law or regulation; and

> *Fifth*: That the market value of the Striped Bass was in excess of Three Hundred and Fifty Dollars ($350.00).

16 U.S.C. §§ 3372 (a)(1); 3373(d)(1)(B).  *See also*, Ninth Circuit Pattern Jury Instructions 9.12 (2011).

Courts have considered the plain language of the statute and determined that the Lacey Act trafficking crime is a "knowing" offense.  As such, the Government need not prove that the Defendants were aware that they were violating the Lacey Act.  In fact, the Government need not prove that the defendants knew of the Lacey Act's existence.  All the Government need prove is

---

[1] The Lacey Act broadly defines the terms "law" and "regulation" as "laws, treaties, regulators or Indian tribal laws which regulate the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants."  16 U.S.C. § 3371(d).  The terms "taken" and "transport" are similarly broadly defined.  *Id*. § 3371(i) & (j).

that defendants were generally aware that it was illegal to harvest Striped Bass through illegal methods (e.g., anchored nets) or while the season was closed.   *See, e.g., United States v. LeVeque*, 283 F.3d 1098, 1106 (9th Cir. 2002) ("To satisfy the *mens rea* requirement of the Lacey Act, the Government need not show that the defendant knew the particular law that was violated."); *United States v. Santillan*, 243 F.3d 1125, 1129 (9th Cir. 2001) ("Lacey Act does not require knowledge of the particular law violated . . . so long as the defendant knows of its unlawfulness."); *United States v. Lee*, 937 F.2d 1388, 1393 (9th Cir. 1991) (holding that so long as the defendant "knew. . . that the salmon had been taken in violation of the [foreign] regulation" he could be liable under the Lacey Act); *United States v. Todd*, 735 F.2d 146, 151 (5th Cir. 1984), *cert. denied*, 105 S. Ct. 957, *reh'g denied*, 105 S. Ct. 1783 (1985) ("The government need not prove that the [defendant] . . . knew of the existence of the Lacey Act itself, only that [he] . . . knew of the illegal nature of the game.") (citing S. Rep. No. 123, 97th Cong., 1st Sess. 11); *United States v. McDougall*, 25 F. Supp. 2d 85, 90 (N.D.N.Y. 1998) (finding "it is sufficient for the government to establish that Porter acted with knowledge" of the violation of state regulations "to sustain the Lacey Act offenses against him").

### c) **Attempt**

The Lacey Act also provides for an *attempt* provision in 16 U.S.C. § 3372(a)(4) (defendants are also charged in Count 22 with aiding and abetting in violation of 18 U.S.C. § 2). The statute specifically states that that "[i]t is unlawful for any person to … attempt to commit *any act* described in paragraphs (1) through (3)" (emphasis added).  Paragraphs "(1) through (3)" refer back to both the trafficking and labeling offenses.  These paragraphs therefore include any attempt to "import, export, transport, sell, receive, *acquire*, or purchase in interstate … commerce … any fish … *taken, possessed*, transported, or sold in violation of any law or regulation of any State …" (emphasis added).  The United States submits that 16 U.S.C. §

3372(a)(4) therefore covers attempts to take fish in violation of State law where such fish were to be sold in interstate commerce. *See, e.g., United States v. Labs of Virginia, et al.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003) (providing instruction for misdemeanor Lacey Act attempt charges); *United States v. Halfmann*, No. 11-CR-241, 2012 WL 3583443, *2 (E.D. Wis., Aug. 20, 2012) (providing similar instruction in aiding and abetting felony Lacey Act violations).

<u>STATEMENT OF FACTS:  CASE OVERVIEW</u>

**1)  MDNR Seizures**

Prior to 3:00 a.m. on February 1, 2011 (when the season officially opened; Chesapeake-GOV-19241), MDNR patrol boats found multiple, illegal "anchor nets" or "lead nets" in the vicinity of Bloody Point on the Chesapeake Bay.  The nets were unattended and anchored to the bottom, all in violation of the COMAR regulations set forth above.  Those illegal nets contained approximately 20,000 pounds of Striped Bass, much of which appeared to have been in the nets for several days and all of which was taken before the season opened.  As MDNR brought up the nets, William Lednum's commercial fishing vessel, the Kristen Marie, arrived.  Michael Hayden, who was also on the fishing vessel, began shouting general indignities at the MDNR officers.  Based on interviews of some of the defendants (and others) as well as accounting records, Michael Hayden and William Lednum were captaining the vessel and Lawrence Daniel Murphy and Kent Sadler were serving as "helpers" that night.  *See, e.g*., Chesapeake-GJ-297, Chesapeake-GOV-10748, Chesapeake-GOV-10827, Chesapeake-GOV-10857, Chesapeake-GOV-4832; Sadler Plea Agreement (Doc. 56).

**2)  Search Warrants & Documentary Evidence**

A search warrant was executed by MDNR in February 2010 at a check-in station frequently used by Hayden and Lednum.  MDNR also executed additional search warrants on

February 11, 2011 at several locations, including Hayden's and Lednum's residences, boats, and vehicles, based, in part, on the events on February 1, 2011.  Those warrants resulted in the seizure of, among other items, cell phones, accounting records, sales records, shipping records, GPS information, MDNR records (i.e., letters/regulations provided with the defendants' allocation cards), nets, weights, and molds for making weights.

Regarding the physical evidence, "molds" used to fabricate weights for the illegal anchor nets were founds in Lednum's garage.  Those molds were sent to the Maryland State Police crime lab for forensic analysis to see if any of the distinguishing marks on the seized weights matched any unique features of the molds.  According to expert analysis and the resulting forensic reports, several of the weights taken from the illegal gill nets were seized on February 1, 2011 by MDNR matched the molds that were found in Lednum's garage.  *See* Chesapeake-GOV-13585 to 13598.

Based on a review of various shipping and accounting records, it became clear that defendants Hayden and Lednum through their companies, and with the help of Sadler and Murphy, had been falsely labeling and then transporting their catches of Striped Bass in interstate commerce since at least 2008.  *See* Chesapeake-GJ-296.  This was, in large part, a scheme to get more tags and conceal the true amount of the harvest from the State of Maryland, U.S. Fish and Wildlife Service, NOAA, Department of Commerce, ASFMC, and IFMP. Distilled, Hayden and/or Lednum would over-report the number of fish they checked-in and under-report the weights, frequently resulting in a significantly lower report total weight of Striped Bass versus the actual weight.  Fraudulently representing at the check-in a larger number of smaller fish allowed them to obtain additional tags from the State of Maryland and use those tags to illegally harvest additional fish (keeping in mind that reputable buyers will not purchase a

Striped Bass without a tag).  This scheme also allowed Hayden and Lednum to conceal the fact

they had exceeded their allocation limit and the regulatory maximum weight (often times 2,000

pounds) of Striped Bass.  In many cases, Hayden and/or Lednum, with help from Murphy, would

check-in large numbers of fish purportedly weighing 2 to 4 pounds while they sold almost

exclusively larger fish (e.g., 5-8, 8+, or 10-14 pound fish) to vendors along the eastern seaboard

with a short time period (oftentimes less than two days).

More specifically, when officers from MDNR and agents from the U.S. Fish and Wildlife

Service ("FWS") compared the sales and shipment records seized during the search warrants

(and obtained pursuant to Grand Jury subpoena) to the check-in sheets submitted by Hayden and

Lednum, there were large discrepancies between the numbers and weights of fish checked-in

versus what was subsequently transported and sold to vendors in Maryland, Pennsylvania,

Delaware, and New York.  *See* Chesapeake-GJ-296. In many cases, the difference between the

totals of what was checked in versus what was sold is staggering.  For example:

- In January 2009, Hayden and/or Lednum "checked in" precisely 3,500 pounds of Striped Bass but sold more than 12,000 pounds to Lou's Fish Market in New York.
- In February 2009, they "checked in" 2,986 pounds of Striped Bass but sold more than 15,000 pounds.
- In the first half of February 2010, before the search warrants were executed at the check-station, they checked in 4,870 pounds of Striped Bass but sold more than 11,000 pounds.

A summary spreadsheet of check-ins versus transactions is attached hereto as Exhibit 1.

## 3)  Interviews & Admissions

In addition to the physical and documentary evidence, several of Hayden's and Lednum's

"helpers" were interviewed in connection with this investigation.  Sadler and Murphy (the

helpers on the boat on February 1, 2011) both admitted to being on the boat, and accounting

records showed they were paid for work they did during that time period.  They further admitted

that they had been helpers on Lednum's boat for the years encompassed in the proposed conspiracy. Two additional helpers (i.e., unindicted co-conspirators) were also interviewed. Both of these individuals reported that Sadler and Murphy were on the boat during the night of January 31, 2011 and early morning hours of February 1, 2011. The other helpers corroborated that Sadler and Murphy fished with Hayden and Lednum in the years prior. Notably, the other helpers indicated that the fishing would be done late at night and that when they fished with Hayden and Lednum they never attended any drift gill nets. The helpers indicated their work was largely limited to retrieving Lednum and Hayden's anchored, unattended anchor nets that had been set overnight (or days prior). The helpers further stated the Striped Bass had been in the nets for some time as the fish were often dead and their eyes had glassed over. The helpers stated that oftentimes more than the vessel limit of Striped Bass were caught on a given trip at which point the captains would (1) radio other fishermen to check in some of the fish under their own allocation cards for a small fee[2]; (2) that Hayden would use his vessel ("the Integrity") as a surplus storage boat to conceal the overage; and/or (3) that the anchor nets would be put back in the water and left there overnight. One helper commented in sum and substance that "there wasn't a day that went by on that boat [Lednum's fishing vessel] when I wasn't asked to do something illegal."

One helper on the boat the night of January 31, 2011 reported that when he arrived at the dock, he and the other co-conspirators were advised, by the captains, that they had set the nets illegally the days prior (i.e., before the season opened) and that their intention was to "haul" as much as possible up the morning of February 1, 2011, once the season had opened and fishing

---

[2]  Following check-in of this surplus fish, Hayden and Lednum would "buy" back or re-claim the fish from the other fisherman. The State of Maryland requires a seafood dealer's license in order to buy or sell another fisherman's catch. See COMAR Md. Code Ann., Natural Resources §§ 4-701(d)(4) (*eff.* 6/1/2007), 4-702(a) (*eff.* 7/1/2007).

was legal.  All individuals on the boat the night of January 31, 2011 and morning of February 1, 2011 were well aware that the Striped Bass in the nets were illegally taken and they were in fact poaching.

The individuals running the check-in stations were also interviewed through the course of the investigation.  They specified that Lednum and Hayden would insist that the weight and numbers of Striped Bass reflected on the check-in documents be falsified.  Furthermore, one of the check-in station managers advised that defendant Hayden contacted him on January 31, 2011 and asked him to meet Hayden with his (the station manager's) panel truck on Tilghman Island the morning of February 1, 2011 in anticipation of a sizable catch (likely greater than 2,000 lbs.).  However, on the morning of February 1, 2011, while in route, the check-station manager received a call from Hayden advising that they no longer needed the truck and he "took a huge loss" or words to that effect.  This comment corresponds with MDNR's seizure of the illegal anchor nets filled with Striped Bass that same day.

In the months after the MDNR seizures, the co-conspirators continued to work with each other and with other helpers in both the Striped Bass season and other fisheries.  During one fishing trip in the months after February 1, 2011, several of the co-conspirators made a fishing trip to Virginia and stayed at a hotel.  Defendant Murphy was perusing Youtube videos when he came upon videos of the MDNR seizures at which point he invited defendant Hayden to watch.  Defendants Hayden and Murphy admitted that it was their nets being seized on the videos and bemoaned the substantial loss of revenue the MDNR seizures had cost them.

**4)  Witness Intimidation**

Several witnesses stated that once the investigation began, Hayden kept tabs on them, knew when they were served Grand Jury subpoenas, and questioned them about what they intended to tell the authorities.  In one case, Hayden instructed a potential witness to refuse to

13

cooperate or to answer any questions before the Grand Jury.  In another instance, Hayden told a different witness to use a story he had used in a prior incident when MDNR caught them with illegal Striped Bass – i.e., that the Striped Bass were caught using hook-and-line tackle, rather than with nets.  That witness later received a call from Hayden after his Grand Jury appearance at which time Hayden said he believed the witness was cooperating and that the witness was "fucked" if the witness cooperated.  Hayden then proceeded to ask, "Why the hell you snitching?" and said, "Don't push your luck," at which point the call was terminated.   Shortly after search warrants were executed and a third witness received a Grand Jury subpoena for documents, he received a threatening call from defendant Hayden.  Specifically, Hayden said, "you rolled on me, motherfucker, a man told me so, that's ok, I will take care of your ass."  Also according to the witness, Hayden told him during the telephone call:  "Don't lie to me bitch.  I have a man who knows … I'll get your ass."

Since the Indictment has been returned, and in spite of their conditions of pretrial release, defendants Hayden and Lednum have targeted witnesses.  More specifically, they have confronted defendant Sadler on numerous occasions at first encouraging certain approaches to the litigation and, more recently, verbally assaulting him.  The United States has provided the defendants the appropriate 404(b) notices.

## CHARGES CONTAINED IN THE INDICTMENT

All defendants were charged in Count 1 with a conspiracy to (1) violate the Lacey Act's trafficking and false-labeling prohibitions and (2) impede and impair the governmental functions of various Federal agencies (a.k.a., the "*Klein*" conspiracy).  Defendants Lednum, Hayden, and Hayden, Inc., are charged with numerous Lacey Act false-labeling and trafficking counts as specified in Counts 2 through 21.  All defendants were charged in Count 22 with an attempt to violate the Lacey Act's trafficking provisions based on their being caught in the act on the

night/morning of January 31 and February 1, 2011.  Defendant Hayden is charged with three

separate counts (Counts 23 through 25) of witness intimidation and retaliation.  Finally, the

United States, in Count 26 of the Indictment, provided notice of its intent to forfeit certain assets

owned by defendants Lednum, Hayden, and Hayden Inc. – i.e., the fishing vessels and other

equipment used in connection with the illegal harvesting, false-labeling, and interstate transport

of Striped Bass during the times specified in the Indictment.

### 1)  Conspiracy

In order to prove a conspiracy under Title 18, United States Code, Section 371, the

government must show: 1) that two or more persons entered into an agreement to defraud the

United States or to commit a federal offense; 2) that the defendant knowingly and willfully

joined the conspiracy; and 3) that at least one overt act was committed by any co-conspirator in

furtherance of the conspiracy.  *See, e.g., United States v. Tedder*, 801 F.2d 1437, 1446 (4th Cir.

1986); *United States v. Snype*, 441 F.3d 119, 142 (2d. Cir. 2006); *United States v. Ceballos*, 340

F.3d 115, 123 (2d Cir. 2003).  In order to convict a defendant, the government must prove that

the defendant knew of the conspiracy and joined it, with the intent to commit the offenses that

were its objectives (in this case, to defraud the United States, to violate the Lacey Act's

trafficking and/or false-labeling provisions), that is, with the intent to make the conspiracy

succeed.  *United States v. Norris*, 749 F.2d 1116, 1121 (4th Cir. 1984), *abrogated on other*

*grounds*; *Ceballos*, 340 F.3d at 123.

The agreement at the core of the conspiracy may be tacit, rather than explicit, *United*

*States v. DePew*, 932 F.2d 324, 328 (4th Cir. 1991), and evidence of a defendant's link to the

conspiracy may be circumstantial in nature, *Norris*, 749 F.2d at 1121.  Indeed, all elements of a

conspiracy may be proven by circumstantial evidence.  *Id.*; *see also Pattern Jury Instructions,*

*Criminal Cases*, Fifth Circuit (1990 Ed.) Title 18 Offenses, Instruction No. 2.21, p. 89; *Federal*

*Criminal Jury Instructions of the Seventh Circuit* (1980 Ed.), § 5.11; *United States v. Brown*, 934

F.2d 886, 889 (7th Cir. 1991); *United States v. Hopkins*, 916 F.2d 207, 212 (5th Cir. 1990)

The conspiracy to defraud the United States prong (a.k.a., *Klein*) is established by the

conspirators' efforts to conceal their illegal fishing from the National Oceanic and Atmospheric

Administration ("NOAA"), FWS, and MDNR by submerging the nets in an effort to make them

undetectable from patrol boats; falsifying documents at the check-in station that is ultimately

submitted to MDNR, IFMP, ASMFC, and the Department of Commerce, which are used, in part

to set harvest quotas among the states and ensure compliance with the Striped Bass Fisheries

Management Plan; and by procuring "tags" under fraudulent pretenses from MDNR.

**2)  Lacey Act**

The United States has provided a granular description of the Lacey Act and those

elements it needs to prove in the preceding "Statutory/Regulatory Framework" section above.

**3)  Witness Retaliation & Tampering**

Defendant Hayden is charged with witness retaliation and witness tampering in violation

of Title 18, United States Code, Sections 1513(b)(2), 1512(b)(1), and 1512(b)(2)(A) respectively.

These charges all relate to defendant Hayden's pre-Indictment efforts to chill and manipulate the

Grand Jury's investigation into his illegal conduct.

With respect to the Section 1513(b)(2) witness retaliation charge, the government must

prove beyond a reasonable doubt that: (1) Witness #1 was a witness with information relevant to

the investigation giving rise to this case; (2) that defendant knew Witness #1 was such a witness;

and (3) that the defendant threatened Witness #1 (4) with the intention of retaliating against that

witness for communicating information to law enforcement.  *See* FEDCRIM- JI3C 6.18.1513B,

Mod. Crim. Jury Instr. 3d. Cir. 6.18.1513B.  The United States intends to submit evidence, by

way of victim testimony and telephone records, that after defendant Hayden learned that Witness

16

#1 had been in contact with law enforcement, he contacted Witness #1 by phone and stated in sum and substance, "You rolled on me, motherfucker, a man told me so, that's ok, … I will get your ass."

Regarding the section 1512(b)(1) witness tampering charge, the United States must prove that: (1) Witness #2 was a witness in the Grand Jury investigation of the case; (2) that defendant knew Witness #1 was such a witness; and (3) that the defendant attempted to corruptly persuade Witness #2 (4) with the intention of having Witness #2 provide false information to the Grand Jury. *United States v. Davis*, 380 F.3d 183, 196 (4th Cir. 2004); *United States v. Wilson*, 796 F.2d 55, 57 (4th Cir. 1986); *United States v. Burns*, 298 F.3d 523, 539 (6th Cir. 2002); FEDCRIM-JI 91, Pattern Crim. Jury Instr. 91 (1988).  The United States anticipates presenting victim and telephone record evidence to establish that, upon learning that Witness #2 was appearing before the Grand Jury, that he should lie and represent that the Striped Bass were caught through methods other than anchor-netting.

Lastly, the Section 1512(b)(2)(A) witness tampering charge requires the United States to prove that (1) Witness #3 was a witness in the Grand Jury investigation of this case; (2) that defendant knew Witness #3 was such a witness; and (3) that the defendant attempted to persuade Witness #3 (4) to withhold testimony from the Grand Jury. *United States v. Victor*, 973 F.2d 975, 978 (1st Cir. 1992).  Here, the United States anticipates victim testimony that upon learning that Witness #3 would be appearing before the Grand Jury, Hayden threatened Witness #3 to withhold all information from the Grand Jury.

These acts of intimidation, and those uncharged acts of intimidation committed by defendants Hayden and Lednum are likewise evidence of consciousness of guilt and are

therefore also admissible to meet the *scienter* requirements of the conspiracy and substantive

Lacey Act charges.

<div align="center">

*IN LIMINE* MOTIONS & OTHER EVIDENTIARY ISSUES

</div>

**1)  Confessions & Non-Testimonial Statements of Co-Conspirators**

**a)  The Statements**

As set forth above, various defendants have made statements to other, non-law

enforcement individuals regarding their involvement in the conspiracy.  More specifically, there

were three inculpatory statements made in front of third-party witnesses that the United States

intends to introduce during its case-in-chief:

- "Check-In Conversations":  During the period of the conspiracy specified in the Indictment, helpers overheard defendants Hayden and Lednum, separately and together, discuss the fact that they would "inflate the number of fish at check-in, so that the fish would appear small … when the fish were actually larger."  These same conversations were said in defendant Murphy's presence.

- "Boat Ride Conversation":  During the morning of February 1, 2011, (before the season was officially open) defendants Hayden and Lednum advised defendant Murphy and another helper while all were on the boat that they were bound for Bloody Point to "pull nets" that were already in the water.  Hayden and Lednum advised Murphy and the helper that the nets were already "loaded" with Striped Bass.  During the boat ride, a phone call was received indicating that MDNR was in the area of Poplar Island.  Hayden exclaimed, "Fuck, we can't go there now they're sitting there waiting," or words to that effect.

- "Youtube conversation":  Sometime after February 1, 2011 when MDNR found the defendants' illegal anchor nets, defendants Hayden, Murphy, and at least one other helper went on a fishing trip to North Carolina where they occasioned a hotel.  While there, defendant Murphy located a Youtube video of the MDNR net seizures and invited Hayden and the other helper to watch.  Both defendants Hayden and Murphy identified the nets as theirs and bemoaned the loss of revenue that resulted from the seizure.

As discussed below, these statements are all admissible pursuant to FRE 801(d)(2)(A),

801(d)(2)(E), and/or 804(b)(3).

**b) The Statements are Admissible as Against the Defendant Who Made Them as Party-opponent Admissions.**

All of the statements above are admissible against the individuals who said them pursuant to FRE 801(d)(2)(A) allowing for the introduction of party-opponent admissions.

In the case of the "check-in" conversations, the individuals who made the statements were admitting to falsifying documents at check-ins (i.e., "labels" for Lacey Act purposes) and defrauding MDNR and the various federal and interstate commissions that rely on the reporting data provided by commercially licensed fishermen.  This check-in falsification practice was also the modus operandi that allowed Hayden and Lednum to procure additional Striped Bass tags from MDNR under false pretenses.

With respect to the "boat ride conversation," the captains were making statements and providing instructions to their helpers to further of one the conspiracy's objectives – specifically to harvest Striped Bass before the season was open and use illegal anchor nets.  Moreover, defendant Hayden's comment that "we can't go there" once he learned law enforcement was in the area is an indication that he was fully aware of the illegality of anchor netting at the time and in the manner he had selected.

Finally, the "Youtube conversation" featured admissions by both defendants Hayden and Murphy that the Striped Bass seized by MDNR were indeed caught in nets set by the conspirators and that they had intended to sell those illegally harvested Striped Bass for pecuniary gain.

c) **The "Check-in" and "Boat Ride" Statements are Admissible as Statements of Co-conspirators in Furtherance of the Conspiracy.**

The admissions of guilt recounted above are not only admissible against the individual defendants who made the confessions (*see* FRE 801(d)(2)(A)), but also as against the other conspirators as statements of co-conspirators made in the furtherance of the conspiracy.

FRE 801(d)(2)(E) states that "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" is not hearsay when introduced against the non-offering party. The standard for admission of a coconspirator statement is clear in the Fourth Circuit:

> A statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy" and is offered against the party. Fed.R.Evid. 801(d)(2)(E). In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy. Idle conversation that touches on, but does not further, the purposes of the conspiracy does not constitute a statement in furtherance of a conspiracy under Rule 801(d)(2)(E).

*United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001) (citing *United States v. Heater*, 63 F.3d 311, 324 (4th Cir. 1995); *see also United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986)). In deciding these factual requisites under a preponderance of the evidence standard, a court "is not precluded from examining the out-of-court statements sought to be admitted; the court may consider those statements in conjunction with other evidence." *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

Regarding the "furtherance of the conspiracy" element, "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994), cert. denied, 514 U.S. 1019 (1995).

Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be "in furtherance" of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives, but not if they were intended to be nothing more than idle chatter or casual conversation about past events. Whether a particular statement to a third party was intended to induce that party to join or assist the conspiracy, hence was "in furtherance" of it, must be determined by careful examination of the context in which it was made.  A particular statement may be found to be "in furtherance" of the conspiracy even though it is "susceptible of alternative interpretations" and was not "exclusively, or even primarily, made to further the conspiracy," so long as there is "some reasonable basis" for concluding that it was designed to further the conspiracy.

*Id.* at 444 (internal citations omitted).

The record, and certainly proof at trial, will demonstrate that there was a conspiracy, that the defendants were part of that conspiracy, and that the admissions made by Hayden, Lednum, and Murphy were made in furtherance of that conspiracy.  More specifically, the "check-in conversations" were statements made by defendants Hayden and Lednum and overheard by third parties.  The conversations recount an effort to recruit and manipulate unindicted co-conspirators (i.e., the check-station managers) to falsify paperwork.  These statements were successful recruitments into the conspiracy and then management of that conspiracy (i.e., specifying how documents were to be falsified at the check-stations).  Likewise, the "boat ride" conversation was similarly an effort to recruit the helpers into joining the conspiracy (to the extent they hadn't done so already) and to specify the manner by which the conspiracy would proceed that night – i.e., pulling up illegal anchor nets that were set before the season opened and then checking in the fish after the season opened several hours later.  Accordingly, all three *Pratt* elements are met and the "boat ride" and "check-in" conversations should be admitted as against all remaining defendants pursuant to FRE 801(d)(2)(E).

**d) All Three Statements are also Admissible as Statements Against Penal Interests.**

The defendants' various admissions set forth above are also admissible under Federal Rule of Evidence 804(b)(3) as self-inculpatory statements.  FRE 804(b)(3) provides that a statement made by an unavailable declarant is admissible if it is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it ... had so great a tendency to ... expose the declarant to civil or criminal liability." *United States v. Dargan*, 738 F.3d 643, 649 (4th Cir. 2013) (citing *United States v. Bumpass*, 60 F.3d 1099, 1102 (4th Cir. 1995)).  In the Fourth Circuit, for such a statement to be admissible, it "must also be 'supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.'" *Id.* (quoting *Williamson v. United States*, 512 U.S. 594, 598-99 (1994)).  Distilled, the statement must be made by an witness who is unavailable and the statement must be both inculpatory and corroborated.

The Fourth Circuit has held that a defendant who invokes his Fifth Amendment right is indisputably unavailable within the meaning of Rule 804(b)(3).  *Id.*  The "inculpatory requirement" has been held to restrict admission to "those declarations or remarks within the confession that are individually self-inculpatory." *Williamson*, 512 U.S. at 599.  Whether this standard is satisfied can only be determined by viewing the statement "in light of the surrounding circumstances."  *Id*. at 603.  The court should look to both the context and the content of the statements to examine their inculpatory qualities.  *Id.*  Where a statement is made to a third-party or co-conspirator (as they were in the case at bar), there is no "obvious motive to shift blame or curry favor."  *Dargan*, 738 F.3d at 649 (citing *United States v. Jordan*, 509 F.3d 191, 203 (4th Cir. 2007)) (internal quotation marks omitted).  Likewise, the Court should examine whether the

statements demonstrate the defendants' knowledge of "significant details about the crime,"
*Williamson*, 512 U.S. at 603, and "implicate him in a conspiracy," *United States v. Udeozor*, 515
F.3d 260, 267 (4th Cir. 2008).

With respect to the "check-in conversations," defendants Hayden and Lednum were
discussing the intricate details of how to falsify paperwork to obtain additional MDNR Striped
Bass tags under the fraudulent pretense of under-reporting fish weights and over-reporting fish
numbers.  The "boat ride" conversation relayed specific knowledge from the captains regarding
where the illegal anchor nets were located, how long they had been there, how they intended to
pull them to evade detection, and how they intended to check-in the fish after the season opened.
Finally, the "Youtube conversation" reflected that both defendants Hayden and Murphy knew
that the illegally set nets, seized by the MDNR on February 1, 2011, belonged to them.  All three
statements were therefore sufficiently inculpatory to satisfy this element of the rule.

Rule 804(b)(3) also requires that statements against interest be supported by
corroborating circumstances. The Fourth Circuit has enumerated several factors relevant to this
particular inquiry, including:

> (1) whether the declarant had at the time of making the statement pled guilty or
> was still exposed to prosecution for making the statement, (2) the declarant's
> motive in making the statement and whether there was a reason for the declarant
> to lie, (3) whether the declarant repeated the statement and did so consistently, (4)
> the party or parties to whom the statement was made, (5) the relationship of the
> declarant with the accused, and (6) the nature and strength of independent
> evidence relevant to the conduct in question.

*Dargan*, 738 F.3d at 650 (citing *United States v. Kivanc*, 714 F.3d 782, 792 (4th Cir. 2013)).

Applying these factors here, the corroboration element is satisfied:  (1) None of the
declarants pled guilty at the time the statements were made.  (2) The motives in the "check-in"
and "boat ride" conversations were to manage the specifics of the conspiracy and to promote its
ends and.  The motive for the "Youtube" conversation appeared to just be complaining.  (3) The

"check-in conversation" appeared to be repeated on several occasions while the others were one time discussions with no need of being repeated.  (4) As discussed above, the parties to whom these statements were made were other co-conspirators or third-parties for whom there was no motive to lie or to shift blame.  (5) In this case, all of the declarants are co-defendants in the same conspiracy case.  Finally, (6) there is voluminous documentary and photographic evidence, as well as witness and expert opinion testimony to establish both the existence and *modus operandi* of the Lacey Act conspiracy and scheme.  The application of these factors countenance admitting all three statements pursuant to FRE 804(b)(3).

**e)   The Admission of Both Statements in the Government's Case-in-Chief Would Not Violate the Confrontation Clause.**

All three conversations recounted above are non-testimonial and their admission is not prohibited by the Confrontation Clause.  The Confrontation Clause provides that "the accused shall enjoy the right . . . to be confronted with witnesses against him."  To be a "witness" as contemplated by the Confrontation Clause, the declarant must offer "testimonial statements." *Davis v. Washington*, 547 U.S. 813, 821 (2006).  The Confrontation Clause therefore applies only to testimonial hearsay and, for instance, "statements made by co-conspirators in furtherance of a conspiracy are not testimonial in nature, even when made unwittingly to undercover government agents."  *United States v. Calderon*, 554 Fed Appx. 143, 154 (4th Cir. 2014); *see also Davis*, 547 US at 823; *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("Under *Crawford* [*v. Washington*, 541 U.S. 36 (2004)], . . . the Confrontation Clause has no application to [out-of-court non-testimonial statements].");  *United States v. Damra*, 621 F.3d 474, 492 n. 4 (6th Cir. 2010); *United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007) ("It is plain from *Davis* that the right to confrontation only extends to testimonial statements, or, put differently, the

Confrontation Clause simply has no application to non-testimonial statements." (internal quotation marks omitted)).

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits the introduction of the confession to law enforcement officers of a non-testifying co-defendant that implicates the defendant in a crime. Because the scope of *Bruton* extends no further than that of the Confrontation Clause, the Supreme Court's decision to limit protections afforded by the Confrontation Clause to only testimonial statements, in turn, also limits the applicability of *Bruton*. "*Bruton* is simply irrelevant in the context of non-testimonial statements." *Dargan*, 738 F.3d at 651; *see also United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) ("[T]he *Bruton* rule, like the Confrontation Clause itself, does not apply to non-testimonial statements."); *United States v. Avila Bargas*, 570 F.3d 1004, 1009 (8th Cir. 2009) (holding that Bruton does not apply to non-testimonial co-defendant statements).

With each of the three conversations the defendants approached a third-party or a co-conspirator and not in any type of venue that could conceivably be considered custodial or testimonial (e.g., a check-station, a boat in the middle of the Chesapeake, and a hotel room, respectively). The check-station managers, helpers, and co-conspirators are obviously not law enforcement officers, nor were any of those individuals acting at the direction of any law enforcement agency at the time the defendants made their admissions. None of the statements were made in response to any form of structured questioning in an investigative environment, nor indeed, in response to any questioning at all. Rather, these admissions were volunteered and were focused on either promoting the conspiracy's objectives or bemoaning its demise. No reasonable person in defendants Hayden's, Lednum's, or Murphy's positions would have

anticipated such comments being used against them in a federal wildlife prosecution.

Accordingly, no *Crawford* or *Bruton* errors would be implicated by allowing such admissions to

be introduced.

### 2)  Regulatory Expert Testimony

On December 19, 2013, the United States provided expert disclosures to the defendants

advising them of the Government's intention to call Captain Lloyd Ingerson and Sergeant Jack

Bailey who would testify, inter alia, about those Federal and Maryland "statutes and regulations

relevant to the commercial harvesting of Striped Bass and  how the regulated community should

comply with such regulations."  The United States believes such testimony will be helpful to

provide the jury context for the testimony they will hear throughout trial and therefore moves to

admit such testimony pursuant to FRE 702.

FRE 702 provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact
to understand the evidence or to determine a fact in issue, a witnesses qualified as
an expert by knowledge, skill, experience, training, or educations, may testify
thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
sufficient facts or data, (2) the testimony is the product of reliable principles and
methods, and (3) the witness has applied the principles and methods reliably to
the facts of the case.

Accordingly, this Court has broad authority under Rule 702 to admit such testimony where it is

satisfied that technical knowledge will assist the trier of fact to understand the evidence or to

determine the fact in issue.  *Daubert v. Merrell Dow  Pharmaceuticals, Inc.*, 509 U.S. 579, 580

(1993); *see also United States v. Baptiste*, 596 F.3d 214, 222 (4th Cir. 2010); *United States v.*

*Benkhla*, 530 F.3d 300, 308 (4th Cir. 2008); *United States v. Wilson*, 484 F.3d 267, 274 (4th

Cir. 2007); *United States v. Crisp*, 324 F.3d 261, 269-70 (4th Cir. 2003) (concluding that though

"the principles underlying fingerprint identification have not attained the status of scientific

law," the expert testimony was admissible); *United States v. Dukagjini*, 326 F.3d 45, 51 (2d Cir. 2003); *United States v. Tapia-Ortiz*, 23 F.3d 738, 740 (2d Cir. 1994). "As long as a law enforcement officer's expert testimony complies with the standards that govern the admissibility of such evidence, it need not be excluded." *United States v. Cruz*, 363 F.3d 187, 193 (2d Cir. 2004); *see also Baptiste*, 596 F.3d at 223 (allowing a detective to function as an expert witness for purposes of Rule 702 because of his expertise and because his testimony "is contemplated by the commentary to Rule 702"); *Wilson*, 484 F.3d at 273-78 (finding a detective who testified both as a fact witness and was qualified to testify as an expert witness as well). Because of their specialized knowledge, agent testimony can be extremely valuable and probative. *United States v. Duncan*, 42 F.3d 97, 101-102 (2d Cir. 1994) (citing *United States v. Mohney*, 949 F.2d 1397, 1406-07 (6th Cir. 1991)), *cert. denied*, 504 U.S. 91. Indeed, expert testimony from a case agent or other regulatory official is generally permitted in district courts throughout the Fourth Circuit. *United States v. Galloway*, 749 F.3d 238, 244 (4th Cir. 2014) ("The district court qualified Special Agent Karas as an expert, based on his 15 years of experience."); *United States v. Johnson*, 587 F.3d 625, 633-34 (4th Cir. 2009); *Wilson*, 484 F.3d at 275.

Expert testimony can encompass explaining "sophisticated aspects of a regulatory system" insofar as it "guid[es] the trier of fact through a complicated morass of obscure terms and concepts." *Duncan*, 42 F.3d 97, 101-102, fn.3 (2d Cir. 1994); *see also United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) ("Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts;" "background on federal securities regulation and the filing requirements" was permissible expert testimony); *United States v. Scop*, 846 F.2d 135, 143 (2d Cir. 1988) (noting that their ruling did not "preclude use of an expert . . . to testify to methods by which share prices may be artificially

27

inflated" in the context of a securities fraud case).  Indeed, the Second Circuit has recognized that such expert testimony regarding complex regulatory concepts is critical insofar as it creates a framework for the jury to properly understand the testimony of other witnesses.  *Duncan*, 42 F.3d at 101 (interpreting *Mohney*, 949 F.2d at 1406-07).

As is the case with IRS or SEC regulations, wildlife regulations (such as those Federal and Maryland regulations pertinent to the commercial harvest of Striped Bass) obviously contain unique terms and concepts with which an average juror will be unfamiliar – e.g., "tagging," "check-ins," "drift versus anchor gill nets," "permit allocation cards," etc.  Allowing regulatory experts, such as Messrs. Ingerson and Bailey, will be "extremely valuable and probative" in orienting the jury as to the core concepts of commercial fishing.  *United States v. Lewis*, 240 F.3d 866, 869-70 (10th Cir. 2001), is instructive on the scope of permissible expert-agent testimony regarding regulatory requirements relevant to environmental and wildlife statutes. There, the defendant was convicted for commercial wildlife hunting violations. On appeal, the Court upheld testimony by a law enforcement official who was asked to describe the basic legal requirements for acquiring an Oklahoma commercial hunting license. The Tenth Circuit reasoned that the agent testified "as to the general requirements of the . . . law regarding commercial hunting licenses, not whether the specific conduct of [the defendant] violated those requirements." *Id*.

Here, Messrs. Ingerson and Bailey will testify exactly as the agent did in the *Lewis* case – i.e., they will orient the jury as to general requirements for commercial Striped Bass fishing in the Chesapeake Bay. They will not, however, offer legal opinions regarding the elements of any of the offenses charged, or, indeed, discuss the criminal statutory provisions applicable to this

case, or draw ultimate conclusions as to the guilt of the defendants. Accordingly, there is a

proper basis to allow the testimony of Messrs. Ingerson and Bailey.[3]

**3)  Defendants' Prior Convictions**

On December 19, 2013, the United States provided the defendants with its FRE 404(b)

notice of its intention to introduce certain convictions and arrests of the defendants.  More

specifically, the United States will seek to introduce the following as evidence of both

knowledge of the aforementioned COMAR regulations relevant to the commercial harvest of

Striped Bass and/or as evidence of common plan and scheme:

- Michael D. Hayden, Jr.
  - On or about June 9, 1999, Michael D. Hayden, Jr., pled guilty to a Maryland Natural Resources citation wherein he illegally possessed Striped Bass out of season.
  - On or about June 3, 1997, Michael D. Hayden, Jr., pled *nolo contendre* and was adjudicated guilty of setting a gill net prior to 3:00 a.m.; failing to retrieve a gill net by the time prescribed by COMAR; and failing to properly mark a gill net.
  - On or about February 11, 1997, Michael D. Hayden, Jr., was charged by MDNR with a citation alleging that he caught Striped Bass on a Saturday and Sunday, failed to attend a gill net as required by COMAR, used a net with weights exceeding the 20-pound limit as prescribed by COMAR.

- William J. Lednum, Jr.
  - On or about March 24, 2008, William J. Lednum, Jr., was adjudicated guilty of using an illegal gill net – i.e., a net that violated COMAR's regulations regarding marking/labeling gill nets used in the Chesapeake Bay.
  - On about January 10, 2008, William J. Lednum, Jr., was charged by MDNR with setting an illegal anchored / non-drift gill-net in violation of COMAR.
  - On or about February 26, 2013, William J. Lednum, Jr., was charged by MDNR with possession of Striped Bass measuring more than 36" in violation of COMAR.

In each of these instances, the evidence described above demonstrates that defendants

Hayden and Lednum were made aware, by virtue of their arrest, charge, and/or conviction, of the

---

[3] Alternatively, if the Court is disinclined to permit such regulatory expert testimony, the United States hereby requests a preliminary charge from the bench to properly orient the jury as to the Lacey Act and COMAR regulations.

very same COMAR regulations that form the basis of the Lacey Act prongs of the conspiracy and the substantive Lacey Act trafficking and attempt charges.  Specifically, the aforementioned list clarifies that the defendants were made aware of the COMAR regulations and prohibitions relevant to netting Striped Bass out of season, setting gill nets prior to 3:00 a.m., failing to properly mark and attend gill nets, possessing a net with weights exceeding the 20-pound limit (i.e., "anchor nets"), and possessing Striped Bass of illegal sizes.  The aforementioned charges and/or dispositions are therefore admissible to prove defendants' knowledge of the COMAR predicates for the Lacey Act trafficking prong of the conspiracy and substantive Lacey Act trafficking and attempt charges.

## 4) Reciprocal Discovery Violations & Motion to Preclude Non-Disclosed Expert Testimony

### a) Discovery Exchange To Date

Shortly after the defendants' arraignment, the United States inquired with the defendants as to whether they sought any materials covered by Federal Rule of Criminal Procedure 16(a). The defendants all replied in the affirmative and the parties executed "discovery agreements." Notably, those discovery agreements obligated the defendants to provide materials pursuant to Rules 16(b), 26.2, expert disclosure obligations, etc.  With that bargained for exchange in hand, the United States provided discovery on December 19, 2013 and supplemented it pursuant to Rule 16(c) on four subsequent occasions February 3, 2014, March 13, 2014, June 16, 2014, and July 10, 2014.  To date, the United States has provided 7,982 documents totaling 34,490 pages. The United States furnished these materials on electronic media capable of loading into litigation software that could be keyword queried, indexed, etc.  In addition, the United States provided *.pdf duplicates and indexes at the defendants' request.  Notably, the United States has requested

reciprocal discovery on no less than four occasions including all materials falling within the

ambit of Fed. R. Crim. P. 12.1, 12.2, 12.3, 16(b), 26.2 and the controlling discovery agreements.

At first, all defendants claimed that they "had nothing" by way of Rule 16(b) materials

but promised to produce such materials as soon as they were received.  Furthermore, all

defendants claimed they did not have any defense covered under Rules 12.1, 12.2, and 12.3.  On

or about June 16, 2013, counsel for defendants Hayden and Lednum advised the United States

that the defendants[4] would be calling experts to testify about the Striped Bass fishery and fish

sizing or something to that effect.  The United States inquired as to why no expert disclosures

had been made.  Counsel reported that they had not made any final decisions to hire the expert

"yet."  The United States reiterated its request of reciprocal discovery (in writing) on several

subsequent occasions and did not receive a response from any defendant.

To date, defendants Hayden and Lednum have furnished no reciprocal discovery

whatsoever despite advising the United States that they may call an expert at trial.  Defendant

Murphy has provided exactly one document purporting to establish an alibi defense that was

disclosed only *after* his motions were filed.

**b) Government's Motion to Preclude Defense Expert Testimony & To Set a Deadline for the Production of All Other Reciprocal Discovery**

The defendants are unjustifiably withholding reciprocal discovery to which the United

States is entitled pursuant to Fed. R. Crim. P. 12.1, 12.2, 12.3, 16(b).  The defendants vacillate

between saying that they "have nothing" or have not "decided" on anything "yet."  This despite

---

[4] It is unclear whether this statement meant that all defendants had collectively entertained hiring such an expert, or whether it was limited to defendants Hayden and Lednum.  The United States sought to clarify, via email whether defendant Murphy intended to call such an expert during the week of July 21, 2014 but did not receive a response.

the fact that certain items covered by Rule 12.1 were attached to motions before they were disclosed.  This is inconsistent with the purpose of Rules 12.1, 12.2, 12.3, and 16(b).

Where, as here, a defendant has requested disclosure pursuant to Fed. R. Crim. P. 16(a), and the government has complied, then "the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items" and "the results or reports of any physical or mental examination and of any scientific test or experiment," provided such items are within the defendants' custody and control and the defendants intend to use such items at trial. *See* Fed. R. Crim. P. 16(b)(1).  Moreover, the defendants must provide notice of an alibi, insanity, or public authority defense upon the request of the government.  *See* Fed. R. Crim. P. 12.1, 12.2, 12.3.  This disclosure obligation has no "triggering" event.

Where a defendant fails, or as here refuses, to provide reciprocal discovery, the trial court has the discretion to provide an appropriate remedy pursuant to Rule 16(d).  Appropriate remedies include ordering the defendants to produce reciprocal discovery or precluding the use of withheld or delayed reciprocal discovery at trial.  *See* Fed. R. Crim. P. 16(d)(2)(A).  Courts have consistently granted court orders compelling defendants to comply with reciprocal discovery where the government seeks materials of the type specified in the statute.  Defendants' arguments that it has not "decided" on evidence to use or defenses to make during any defense case is not an adequate basis to delay production.  Courts have rejected the defense argument that they need not provide reciprocal discovery where they have not yet decided whether to put on a case.  *See, e.g., United States v. Jasper*, 00-CR-825 (PKL), 2003 WL 223212, *3 (S.D.N.Y., Jan. 31, 2003) (holding that defendant charged with embezzlement was required to furnish expert disclosure even where the defense had not decided whether that expert would testify); *United*

*States v. Ryan*, 448 F.Supp. 810, 811 (S.D.N.Y.1978) (holding that defendant was required to produce reciprocal discovery even where defense had not yet made the strategic determination of whether or not a defendant would testify; further reasoning that "while the refusal to testify is constitutionally protected, the trial strategy determination is not so protected.  Since the defendant had availed himself of the strategy to obtain discovery of the government, he must comply with the requirement for reciprocal discovery").

Courts are particularly cognizant of reciprocal discovery obligations with respect to defense experts.  The prosecution's awareness of the defense's proffered experts' identities, qualifications, predicted testimony, and the bases for their findings is critical for adequate trial preparation and to enable a smooth trial. Courts "require[] disclosure of expert witness testimony as part of its authority to regulate discovery, and to promote an orderly trial." *United States v. Russo*, 483 F.Supp.2d 301, 310 (S.D.N.Y. 2007).  The expert disclosure requirements serve several significant purposes: 1) they address one of counsel's most basic discovery needs – to learn whether the opposing party intends to call an expert witness and to provide counsel a basis for determining whether in fact the witness qualifies as an expert pursuant to the Federal Rules of Evidence; 2) by requiring production of a written summary of the expected testimony for each expert, the rules are intended to permit more complete pretrial preparation by the requesting party; and 3) by requiring a summary of the bases of each expert's opinions, the rules permit counsel to properly prepare for cross-examination of the expert.  *See* Rule 16 Advisory Committee Notes.

Moreover, requiring pretrial disclosure of expert testimony permits the filing of appropriate *Daubert* and other motions.  While the rules do not provide for a specific time period, "the case law is clear that it is not an abuse of discretion for a trial court to disallow

expert testimony where a late proffer of evidence by the defense substantially prejudices the government in its ability to find its own expert." *United States v. Dorsey*, 45 F.3d 809, 816 (4th Cir. 1995) (denying defendant's expert testimony in the context of scientific testing where notification was the first day of trial).  Moreover, the rules specifically contemplate the exclusion of evidence under appropriate circumstances.  Rule 16 explicitly provides that "[i]f a party fails to comply with this rule, the court may . . . prohibit a party from introducing the undisclosed evidence or . . . enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).  Courts consider a number of factors when selecting a proper sanction for a discovery violation, including: "1) the reasons for failing to provide the required material, including whether the defense acted in bad faith; 2) the extent of prejudice to the government arising out of the failure to provide the mandated information; and, 3) the feasibility of curing the prejudice with a continuance." *See, e.g., United States v. Wicker*, 848 F.2d 1059 (10th Cir. 1988) (suppressing government expert testimony for violation of Rule 16 where there was not finding of bad faith, disclosure was made several days before trial, but the objection was raised during trial thereby eliminating a continuance as a possible remedy); *United States v. Taylor*, 71 F. Supp. 2d 420, 422 (D. N.J. 1999).  In that regard, "maintain[ing] the integrity and schedule of the court" is an appropriate basis for the exclusion of non-compliant evidence.  *See Wicker*, 848 F.2d at 1061.  A district court's decision to exclude expert testimony for a violation of Rule 16 may be reversed only for an abuse of discretion.  *See United States v. Iskander*, 407 F.3d 232, 239 (4th Cir. 2005).

Here, the United States has fully satisfied its disclosure obligations.  Likewise, the United States has appropriately made repeated written requests for reciprocal discovery under Rules 12.1, 12.2, 12.3, and 16(b) on numerous occasions over the past ten months.  The defendants

have vacillated between the excuse that the defendants "have nothing" or "haven't decided on anything yet" (the obvious implication being that discoverable materials are in the custody and control of the defendants but they haven't "decided" to use it yet).  By withholding reciprocal discovery in the manners described above, the defendants are prejudicing the litigation rights of the United States by both limiting its ability to file pretrial motions (e.g., *Daubert* if appropriate) and in its trial preparation (e.g., preparing for an effective and organized cross of experts identified by the defense).  Accordingly, the United States requests that the defense be precluded from presenting any expert testimony they have not yet identified and that the Court set a deadline for all additional reciprocal discovery two weeks prior to the start of trial.

## OTHER TRIAL ISSUES

**1)  Overt Acts Not Listed in the Indictment are Admissible to Prove the Conspiracy.**

The United States is entitled to prove overt acts that are not listed in the indictment, and such uncharged acts can provide the basis for a conviction on a conspiracy count. *United States v. Janati*, 374 F.3d 263, 270-71 (4th Cir. 2004); *Zimmerman v. United States*, 3:07CV295, 2011 WL 744509, *13 (W.D.N.C. Feb. 23, 2011); *McLean v. United States*, 3:07CV331, 2011 WL 148313, *25 (W.D.N.C. Jan. 18, 2011); *United States v. Bryan*, 122 F.3d 90, 93 (2d Cir. 1997) (citing *United States v. Armone*, 363 F.2d 385, 400 (2d Cir. 1966)); *United States v. Frank*, 156 F.3d 332, 337-38 (2d Cir. 1997) (citing cases); *United States v. Schurr*, 794 F.2d 903, 908 (3d Cir. 1986); *United States v. U.S. Gypsum Company*, 600 F.2d 414, 419 (3d Cir.), *cert. denied*, 444 U.S. 884 (1979); *United States v. Harris*, 542 F.2d 1283, 1300 (7th Cir. 1976), *cert. denied*, 430 U.S. 934 (1977); *United States v. Adamo*, 534 F.2d 31, 38-39 (3d Cir.), *cert. denied*, 429 U.S. 841 (1976); *Brulay v. United States*, 383 F.2d 345, 350-51 (9th Cir.) (holding that a conspiracy conviction may rest upon proof of an overt act not charged in the indictment), *cert. denied*, 389 U.S. 986 (1967).

**2) The Lack of Stipulations Will Necessitate Calling Additional Witnesses and Unnecessarily Prolong the Trial.**

When the United States provided its first discovery production, it also proposed several stipulations aimed at shortening the length of the trial – notably, stipulations with respect to business records. To date, the parties have been unable to reach agreement on any stipulations.

Accordingly, the United States will seek to introduce certain business records of the defendants, seized from their places of business and residences or obtained via grand jury subpoena. Based on pretrial discussions with defendants, the United States anticipates needing to call numerous witnesses to establish the authenticity of these records. This will significantly lengthen this trial.

Irrespective of whether the defendants stipulate to records seized pursuant to a search warrant, so long as the records relevant to the charges are obtained during a lawful search and seizure, or pursuant to grand jury subpoena, they may be introduced through the case agent without additional foundation or authentication. Federal Rule of Evidence 901(b)(4) permits authentication by means of "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Numerous appellate courts have upheld the trial court's introduction of documents incriminating to the defendant and/or co-conspirators obtained during a search warrant, or grand jury subpoena, without testimony beyond that of a government agent. *United States v. Smith*, 63 F.3d 766, 769-70 (8th Cir. 1995) (foundation and authentication satisfied); *United States v. Calbas*, 821 F.2d 887, 893 (2d Cir. 1987); *United States v. Reyes*, 798 F.2d 380, 383 (10th Cir. 1986) (citing cases); *United States v. Millan-Colon*, 836 F. Supp. 1007, 1014-15 (S.D.N.Y. 1993) (finding that drug records seized from a defendant were admissible through government witness as non-hearsay statements of co-conspirators even though the precise identity and author of the documents was unknown, but

36

they were clearly authored by one of the co-conspirators).  Therefore, the United States requests

that the Court permit the use of a government agent's testimony to authenticate documents seized

from the defendants' residences or businesses pursuant to search warrant or obtained pursuant to

Grand Jury subpoena.

**3)  The United States intends to call several cooperating witnesses.**

The United States will elicit testimony from witnesses who are cooperating as part of the

terms of their plea agreement.  Such agreements will be furnished to the other parties when the

United States provides its Jencks material to the defendants.

CONCLUSION

For all the foregoing reasons, the United States respectfully requests an Order of this Court granting the United States' *in limine* motions and motions to compel discovery along with such other relief this Court deems just and proper.

Respectfully submitted this 25th day of July, 2014.

ROD J. ROSENSTEIN                                   SAM HIRSCH
United States Attorney                              Acting Assistant Attorney General
Eastern District of Tennessee                       United States Department of Justice

By:   */s/ P. Michael Cunningham*              By:   */s/ Todd W. Gleason*
      P. Michael Cunningham                          Todd W. Gleason
      Assistant United States Attorney               Senior Trial Attorney
      800 Market Street, Suite 211                   U.S. Department of Justice
      Knoxville, TN 37902                            Environmental Crimes Section
      (865) 545-4167                                 P.O. Box 7611
                                                     Washington, D.C. 20044
                                                     (202) 305-0739

                                                     */s/ Shennie Patel*
                                                     Trial Attorney
                                                     U.S. Department of Justice
                                                     Environment and Natural Resources
                                                     Division
                                                     Environmental Crimes Section
                                                     Telephone: 202-305-0295
                                                     Fax: 202-514-8865
                                                     E-mail: shennie.patel@usdoj.gov

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 25, 2014, the foregoing along with all exhibits was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's electronic filing system.

Date: July 25, 2014

<div style="margin-left:40%">

Respectfully submitted:

/s/ Todd W. Gleason

Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources
Division
Environmental Crimes Section
Telephone: 202-305-0739
Fax: 202-514-8865
E-mail: todd.gleason@usdoj.gov

</div>